## Eldridge G. Merick and others v. Paul McNally and another.

*Timber: Measurement: Particular market: Standard.* When parties agree to furnish timber suitable for a market named, the measurement should be made according to that standard, and not by any different one which may be followed in the home market. They must be regarded as contemplating what that market requires.

*Quebec market: Custom: Measurement: Contract.* A custom in the Quebec market to reject fractions of a foot in the measurement of the cubic contents of square timber, to make up for waste in handling, etc., cannot be held unreasonable, and must be held to have been contemplated by the contract. It must be assumed that the market price will be affected by its allowance or non-allowance, and the percentage lost is not excessive; and the parties were bound to perform their agreement as they made it.

*Quebec market: Timber: Deficiency in size: Damages.* So, when the market rates at Quebec (for which the timber was designed under the contract) discriminated between timber averaging seventy feet to the stick and smaller sticks, and the contract called for that average, the damages for a deficiency in the size of the timber furnished should be reckoned by the rates in that market, which both parties referred to in their contract; no other rule would make the injured party whole for his loss.

*Timber: Average size: Deficiency: Damages: Contract construed.* Where an agreement was made for sixty thousand cubic feet of timber, at a price named, to average not less than seventy feet to the stick, and a subsequent agreement was made to take more timber on the same terms, the purchaser was entitled to have the whole lot average seventy feet to the stick, and to damages for any deficiency in that average.

*Timber: Vendor: Vendee: Delivery: Expenses: Contract construed.* When timber was to become the property of the purchaser as soon as cut, and the vendors, for the price agreed upon, were to deliver it "in a convenient manner for loading at the stern of the vessels M., F. & E. may send for it, and should any vessel they may send require a portion of the timber to finish

cargo outside of the bar at mouth of Saginaw river, said McNally to raft it up free of charge, in a secure manner to tow outside:"—

*Held*, That the purchasers could not be held for any expenses in caring for it while in the river, awaiting its delivery at the vessels, except in case of unreasonable delay in sending vessels.

*Heard January 7. Decided January 14.*

Error to Bay Circuit.

*Green & Scofield* and *Ashley Pond,* for plaintiffs in error.

*Marston & Hatch,* for defendants in error.

CAMPBELL, J.

The suit below was brought on behalf of McNally, as original contractor, and Henratty, as his assignee of a half interest in the contract, against plaintiffs in error, to recover the price of lumber furnished. The defense rested on an alleged failure to comply with the contract. The agreement was made September 21, 1869, for the purchase of timber, to be delivered in the early part of the next year; and the terms which are material in this present record, are as follows:

"Said Paul McNally agrees to get out and deliver to said Merick, Fowler and Esselstyn, at or near Wenona, sixty thousand cubic feet square white oak timber, to be sound, straight, well lined and well dressed, and every way suitable for Quebec market, and to average not less than seventy feet to the stick; to be ready for shipment on the opening of navigation next spring, and to be delivered in a convenient manner for loading at the stern of the vessels Merick, Fowler and Esselstyn may send for it; and should any vessel they may send require a portion of the timber to finish cargo outside of bar at mouth of the Saginaw river, said McNally to raft it up free of charge, in a secure manner to tow outside." The remaining clauses

refer chiefly to terms of payment, and to the places from which the timber was expected to be cut. It was also agreed that the purchasers might, at any time, send a person to inspect and mark the timber; and that if McNally got out more timber than was named, they should have a preference in the purchase.

A considerable amount in excess was delivered to the purchasers, of which there were claimed to be enough pieces averaging seventy feet, to make up the sixty thousand feet specified, while the remainder was much smaller, and of much less value per foot.

Upon the trial, a witness, sworn to be familiar with the custom of measuring square oak timber got out for the Quebec market, was asked: "Are you able to state what the custom is with regard to measuring fractions of a foot?" This was objected to. Thereupon counsel for plaintiffs in error stated that they proposed to show, that the custom has been and is general, that all square oak timber for the Quebec market, is measured without reference to the fractions of a foot; that they are thrown out, and no inches or parts of an inch are measured, according to the custom of measurement for that market; that this custom existed through the Saginaw valley, and was intended to supply what is necessarily lost in the handling and moving the timber, which reduces the quantity as much, or more, in the market, as the amount deducted.

The court rejected the evidence, on the ground that the custom was unreasonable.

We think the interpretation claimed for this custom, by the defendants in error, on the argument in this court, namely: that all measurements of width and length, beyond even feet, were rejected, is not the true meaning. At that rate, any timber less than a foot wide would count as nothing, and timber an inch short of two feet in width, would

count as a foot wide. This is evidently a different thing from what the evidence shows to have been meant, which is, merely, that if the cubic contents of a log should be a certain number of cubic feet, and a fraction of a foot over, the fraction should not be counted.

It appears from the testimony, that the amount of fractions that would be thrown out, on the whole timber furnished, would be between four hundred and fifty and five hundred feet, or in the neighborhood of three-fourths of one per cent.

The case shows further, and it is part of the common knowledge of the country, that where trees are cut for such timber, not only is the outside timber, beyond the lines where a broad plane surface can be reached, rejected, but, where the sides are not parallel, all is rejected in the estimate beyond that included within the width of the shortest opposite sides. The reason for this is obvious enough; for the timber is valued as square timber, and that which cannot be brought within squared proportions, is of no use as such timber.

There does not appear to be any thing unreasonable in a custom which seems to be founded on very similar principles to those which reject such useless portions of the log, that is, upon an equivalent waste, or supposed waste, in handling. The percentage is small, and it must necessarily be assumed that a compliance with the custom will have its effect upon market values. If, in any market, such fractions are usually rejected, no one will give the same price, and pay for the fractions, that he would give for the same timber measured in even feet. The custom is not in any way oppressive, and is, we think, no more unreasonable than the custom of taking no account of the timber outside of the square. A small percentage is nominally lost, but, if the parties choose to deal on such terms, they

lose nothing in prices, and each gets all he bargains for. The customs of business are full of such compromises, and there is no very good reason why they should be interdicted.

The timber being expressly mentioned in the contract as required to be suitable for the Quebec market, that must be regarded as the standard which the parties have selected, instead of any possibly different home standard, and they should be held to their agreement as made.

The same considerations will apply to the exclusion of testimony in regard to the difference in value, in the Quebec market, between timber averaging seventy feet to the stick, and that averaging less.  While, in the absence of any thing to the contrary, damages must generally be estimated according to rates prevailing at the place of delivery, yet it is competent to contract with reference to rates elsewhere; and where the timber is expressly prepared for a particular market, and to be of certain dimensions, the only rule that can be just, must be one which would make the injured party whole, if he disposed of the timber as it appeared under the contract he expected to.

. Another question is presented, involving some difficulty. Instead of delivering merely sixty thousand feet, a large amount was delivered in excess.  There was claimed to be enough delivered to make out a lot of sixty thousand feet and upwards, which would average seventy feet per log; but the remainder would fall very far below that, and the average of the entire lot delivered, was also much below seventy feet.

The court held that if sixty thousand feet could be found, averaging seventy feet per log, the vendors were entitled to the full contract price per thousand for that amount, without reference to the size of the remainder; though the excess was agreed to be delivered under, and upon the same terms with, the original agreement.

It appears from the express terms of the contract, that the purchasers did not desire, and could not be compelled, to receive any timber of less average than that named. But, from the nature of the transaction, it could never be known whether the logs delivered would reach that average, until a large portion, at least, had been delivered; and the purchasers were necessarily compelled to take such as should come to hand.    The original contract provided, expressly, that the purchasers should be entitled to take any excess; and if, before the first contract was filled, it was agreed that more logs should be delivered on the same terms, it is plain enough that if, after delivering sixty thousand feet not reaching the average, the remaining logs delivered should bring up the whole to that average, it could not be just to give damages for the short-coming on the first sixty thousand feet, and allow only the contract price for the remainder.    The reasonable rule would be, to regard the whole amount furnished under the same agreement, as one lot; and the same principle which would render it unjust to separate it into two lots in the one case, would apply in the other.    The intention to accept no timber that would not reach that average, would be defeated entirely by such a division.

A question also arose upon the trial, whether the duty of caring for the timber in the river, until called for by vessels, was in the vendors or in the purchasers.    The court held that, if it was delivered in the river, at or near Wenona, in a convenient manner for loading at the stern of vessels sent by the purchasers, the latter could not charge for their expenses in caring for it at such place of delivery, after they had received reasonable notice of such delivery.

The clause in the contract relating to delivery, if taken by itself, is, perhaps, ambiguous.    It leaves it doubtful just what the rights of the parties were.    But the context and the general scope of the contract throw light upon it.    The

timber was, by the agreement, to be purchased while standing, with the money advanced, and was to become at once the property of the plaintiffs in error. The delivery, therefore, was not intended as the completion of title; and before it could take place anywhere, McNally was the bailee of the purchasers. It was "to be ready for shipment at the opening of navigation, and to be delivered in a convenient manner for loading at the stern,—not of vessels generally,—but "of the vessels Merick, Fowler and Esselstyn may send for it." And it was further provided, that, "should any vessel they may send require a portion of the timber to finish cargo outside of bar at the mouth of the Saginaw river, said McNally to raft it up free of charge, in a secure manner to tow outside." Here was a duty that could only be required, or performed, as each vessel was loaded and found more or less capable of taking a full load inside of the bar; and it made it necessary for McNally, or his men, to be on hand as each vessel took on her lading. We think it evident from this that the duty of delivery was continuous, and that it was for McNally to have the timber ready for each vessel. Of course, if vessels were not sent reasonably, he might have his right to complain of any default. He, and not they, had a right to select the places of delivery, and to have as many, or as few, as he chose. The final payment of six cents a foot was to be made when the timber was shipped, not when delivered otherwise. All this would be more consistent with *his* duty to deliver at each vessel's arrival, than in any other way, and such, we think, was the meaning of the agreement.

The judgment must be reversed, with costs, and a new trial granted.

CHRISTIANCY, CH. J., and GRAVES, J., concurred.

COOLEY, J., did not sit in this case.